1　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　　MIDDLE DISTRICT OF TENNESSEE
2　　　　　　　　　　NASHVILLE DIVISION

3

4　UNITED STATES OF AMERICA　　　　）
　　　　　　　　　　　　　　　　　　　）
5　VS　　　　　　　　　　　　　　　　）　No. 3:18-cr-0199
　　　　　　　　　　　　　　　　　　　）
6　TARIUS CLAYBROOKS　　　　　　　　）
　———————————————————————————————————————

7

8　　　　　　BEFORE THE HONORABLE JOE BROWN,

9　　　　　　　　　　MAGISTRATE JUDGE

10　　　　**TRANSCRIPT OF ELECTRONIC RECORDING**

11　　　　　　　　　August 29, 2018

12　———————————————————————————————————————

13　APPEARANCES:

14　For the Government:　　　J. CHRISTOPHER SUEDEKUM
　　　　　　　　　　　　　　　Asst. U.S. Attorney
15　　　　　　　　　　　　　　110 Ninth Ave S., Suite A961
　　　　　　　　　　　　　　　Nashville, TN 37203
16

17　For the Defendant:　　　KARL E. PULLEY
　　　　　　　　　　　　　　　PO Box 68352
18　　　　　　　　　　　　　　Nashville, TN 37206

19

20　———————————————————————————————————————

21　PREPARED FROM **ELECTRONIC RECORDING** BY:

22　**Roxann Harkins, RPR, CRR**
　　Official Court Reporter
23　801 Broadway, Suite A837
　　Nashville, TN 37203
24　615.403.8314.
　　roxann_harkins@tnmd.uscourts.gov

25

1          **I N D E X**

2     Government witness

3

      **JOSEPH WINTER**
4
      Direct Examination By Mr. Suedekum ..................7
5     Cross-Examination By Mr. Pulley ....................12
      Redirect Examination By Mr. Suedekum ...............18
6

7     Defense witnesses

8     **DERRICK MCWILLIAM**

9     Direct Examination By Mr. Pulley ...................20
      Cross-Examination By Mr. Suedekum .................24
10
      **TEMICKA CAMPBELL**
11
      Direct Examination By Mr. Pulley ...................26
12
      **REONESHEE WELCH**
13
      Direct Examination By Mr. Pulley ...................30
14    Cross-Examination By Mr. Suedekum .................34

15    **ANDRA CLAYBROOKS**

16    Direct Examination By Mr. Pulley .................38

17

18

19

20

21

22

23

24

25

1

2          The above-styled cause came to be heard

3     on August 29, 2018, before the Hon. Joe Brown,

4     Magistrate Judge, when the following proceedings were

5     had to-wit:

6              **TRANSCRIPT OF ELECTRONIC RECORDING**

7                           **\*\*\***

8

9          THE COURT:  All right.  We're here today

10    on a detention hearing and the arraignment of

11    Mr. Claybrooks.  So might as well get the arraignment

12    out of the way first.  Mr. Pulley, is the -- I believe

13    the defendant's gotten a copy of the indictment.  You

14    want to waive formal reading or --

15          MR. PULLEY:  He does and I do,

16    Your Honor.

17          THE COURT:  All right.

18          MR. PULLEY:  Thank you.

19          THE COURT:  And enter a plea of?

20          MR. PULLEY:  Not guilty, if you would,

21    Your Honor.

22          THE COURT:  All right.  Plea of not

23    guilty to all counts will be entered.

24          And we have the detention motion, then.

25    So looks like the parties are ready.  It's the

1  government's motion to start with.

2  MR. SUEDEKUM:  Yes, Your Honor.  This is

3  a presumption case.  I'm happy to put on Sergeant

4  Winter first if you'd like me to go ahead and do that.

5  THE COURT:  You know, I think you're

6  correct.  It is obviously a presumption case, but

7  frankly, it to me is a little easier for me to get

8  some of the facts out to start with.

9  MR. SUEDEKUM:  Yes, Your Honor.  Happy to

10  do that.

11  THE COURT:  Okay.

12  MR. SUEDEKUM:  If I may, I'll call

13  Sergeant Winter up in a moment.  Just to give you a

14  quick proffer of what we're dealing with with this

15  case.

16  THE COURT:  Yes.

17  MR. PULLEY:  If I may address a

18  housekeeping matter, Your Honor.

19  THE COURT:  I'm sorry?

20  MR. PULLEY:  A housekeeping matter with

21  the Court.  May I speak to the Court?

22  THE COURT:  Sure.

23  MR. PULLEY:  I have my assistant here

24  with me today and I'd like permission to be able to at

25  least turn around and maybe sit behind me with the

1    Court's permission.

2              THE COURT:  Sure, no problem.

3              MR. PULLEY:  Thank you so much,

4    Your Honor.

5              MR. SUEDEKUM:  Your Honor, the indictment

6    in this case stems from a traffic stop in June of

7    2018.  The defendant was found in possession in his

8    vehicle of a loaded firearm, with 18 rounds of

9    ammunition, approximately a total of 170 grams of

10   marijuana, plastic baggies, cash, scales.

11             The defendant gave statements at the

12   scene after he was placed under arrest admitting that

13   the marijuana was his, acknowledging that the gun was

14   in his backpack.  I think he tried to say that someone

15   else had bought the gun, but he was aware of it,

16   nonetheless.

17             Based on that, he's been charged with

18   possession of intent to distribute marijuana, felon in

19   possession of a firearm and possessing a firearm in

20   furtherance of a drug trafficking crime.

21             I'll call Sergeant Winter in a second to

22   discuss the details of the traffic stop.  But would

23   just also note, Your Honor, this is not

24   Mr. Claybrooks's first run-in with the law for either

25   of these offenses.  He has three prior convictions for

1  drug trafficking, which you'll hear about, as well as
2  three prior convictions for possessing a firearm.
3          So it will be -- the evidence that we
4  present and our contention that there are no
5  conditions that can ensure the safety of the
6  community, and so we are seeking detention for that
7  reason, Your Honor.
8          THE COURT:  All right.  I've gotten a
9  copy of the pretrial services report, both sides have
10  a copy and you may retain the copy pending the
11  conclusion of the case.  And Mr. Pulley, when we get
12  to your case, you can let me know if you have any
13  objections to the factual portions of the report.  I
14  understand, obviously, you don't agree with the
15  recommendations.
16          MR. PULLEY:  You are correct, Your Honor.
17          THE COURT:  The recommendations are
18  separate from the factual part.
19          MR. PULLEY:  Yes, sir.
20          THE COURT:  All right.
21          MR. SUEDEKUM:  At this time, Your Honor,
22  call Sergeant Winter to the stand.
23          THE COURT:  Okay, Sergeant Winter.
24
25

1                    **JOSEPH WINTER**

2    called as a witness, after having been first duly

3    sworn, testified as follows:

4                    **DIRECT EXAMINATION**

5    BY MR. SUEDEKUM:

6         Q.    Can you please state your name and spell

7    your last name for the record.

8         A.    Joseph Winter, W-i-n-t-e-r.

9         Q.    Who are you employed with?

10        A.    With Metro-Nashville Police Department

11   since 2001.

12        Q.    And what is your position?  What do you

13   do there?

14        A.    Currently I'm a supervisor in the

15   Specialized Investigation Division.

16        Q.    And generally what does that entail?

17        A.    Oh.  My position now is acting as a

18   liaison between our federal partners, prosecutors on

19   gun cases specifically, along with coordinating some

20   other information regarding, you know, crime scene

21   linkages and things of that nature.

22        Q.    In your time of working with the Metro

23   Police Department, do you also have experience dealing

24   with drug trafficking and gun offenses?

25        A.    Yes, sir.  Prior to my current

1    assignment, I actually served a little over six years

2    in our gang unit, and that's almost exclusively what

3    we -- what we investigated was, you know, gang

4    offenders that were in gun crimes and drug crimes.

5          Q.    Are you familiar with a traffic stop that

6    occurred on June 4 of 2018 that involved the

7    defendant, Tarius Claybrooks?

8          A.    Yes, sir.

9          Q.    Were you -- just to be clear, were you

10   personally involved in that traffic stop?

11         A.    No, sir.

12         Q.    Have you -- you've reviewed the reports

13   as a result of that traffic stop?

14         A.    Yes, sir.

15         Q.    And based on reviewing that information,

16   are you familiar with what happened?

17         A.    Yes, sir.

18         Q.    Can you please briefly describe what

19   happened after officers initiated the traffic stop of

20   the defendant on June 4, 2018?

21         A.    Yes.  According to the reports I was able

22   to review, they initiated the traffic stop around

23   D.B. Todd and St. Louis in north Nashville.  The

24   original stop was for basically a registration

25   violation.  The defendant attempted to get out of the

1  car when they initially stopped him.  They told him to

2  get back in, he complied.

3          They were unable to inspect the sticker

4  because I think there was an 18 sticker that was

5  actually on the license plate even though the

6  registration had lapsed.  And they were able to

7  determine that the sticker didn't actually go to that

8  vehicle.  So then they went over and asked

9  Mr. Claybrooks out of the car.  They struggled a

10  little is what the reports say, but he didn't

11  physically assault the officers or anything like that,

12  getting him into custody, taking him into custody for

13  that registration violation.

14      Q.   At the time they took him into custody,

15  did they search his person?

16      A.   Yes.  Search incident to the arrest they

17  found about five grams of marijuana, I think, in his

18  front left pocket.  Based on that, they then went to

19  search the vehicle.  After I believe they -- I don't

20  know if they were able to put him in the back of the

21  car, the patrol car before they searched the vehicle

22  or after.  Typically our practice would be to put them

23  in the car to secure them and then search the vehicle.

24          When they searched the vehicle is when

25  they found a bag that contained all of the things that

1   you listed earlier with the 165 grams of marijuana,

2   the pistol, an extra magazine, some baggies, some

3   scales.  And I think $210 in currency.

4        Q.   Just to be clear, the vehicle that you

5   stopped, who was that vehicle registered to?

6        A.   It was registered to Mr. Claybrooks.

7        Q.   Did you subsequently speak with

8   Mr. Claybrooks -- or not you.  Did the officers

9   subsequently speak with Mr. Claybrooks after they

10  searched the vehicle?

11       A.   There -- I know there was some dialogue.

12  I don't know what the format of that was, whether it

13  was formal questioning or if it was maybe even

14  utterances by Mr. Claybrooks, but there was dialogue,

15  yes, sir.

16       Q.   After the officers had located the

17  backpack in the back seat of the car, did

18  Mr. Claybrooks confirm that that was, in fact, his

19  backpack?

20       A.   Yes, sir.

21       Q.   Did he say more or less that he took it

22  with him everywhere he went?

23       A.   Yes, sir.

24            MR. PULLEY:  Objection to the leading,

25  Your Honor.

1          THE COURT:  You are leading a trifle.

2          MR. SUEDEKUM:  Yes, Your Honor.

3    BY MR. SUEDEKUM:

4          Q.   And can you please go through, again,

5    what was found inside the backpack that Mr. Claybrooks

6    identified as his?

7          A.   Sure.  It was approximately 165 grams of

8    marijuana, baggies, I think it was 150 count was the

9    number noted on the box.  $210 in currency --

10          THE COURT:  I'm sorry, how much?

11          THE WITNESS:  How much of?

12          THE COURT:  Currency.

13          THE WITNESS:  Currency?  $210.  And then

14    the -- the .45 caliber weapon with an extra magazine.

15    I think the currency broke down into mainly small

16    bills, lots of ones, and then there was some tens and

17    twenties.

18    BY MR. SUEDEKUM:

19          Q.   And just to clarify, do you recall

20    whether there were scales also found in the backpack?

21          A.   Yes, sir, there were.

22          Q.   Are you also familiar with the

23    defendant's criminal record?  Have you had a chance to

24    review that information?

25          A.   Yes, sir.  In preparation I mainly pulled

1    everything from the Tennessee Criminal Justice Portal,

2    which is the TOMAS record.  And the TOMAS lists dates

3    of offenses, counties of offenses and what the actual

4    conviction is.  So from nineteen ninety- –– in

5    Mr. Claybrooks's example, from 1997 to 2011 there was

6    three convictions, felony convictions for what is

7    described as Schedule II drug offenses and three

8    convictions for felony possession of a weapon during

9    that same time period.

10            MR. SUEDEKUM:  Thank you.  No further

11   questions, Your Honor.

12            THE COURT:  All right.  Any cross?

13            MR. PULLEY:  If you would, Your Honor,

14   thank you.

15                     **CROSS–EXAMINATION**

16   BY MR. PULLEY:

17       Q.    Good afternoon, Sergeant Winter.

18       A.    Afternoon.

19       Q.    I'm Karl Pulley, and I represent the

20   defendant in this matter.  And so let's –– let's begin

21   initially, you were not even present at the alleged

22   crime scene?

23       A.    Correct, sir.  Everything I know I've

24   reviewed from the –– from the Metro police officer's

25   reports that were submitted after the incident.

1       Q.    So simply it's something that you read

2   that you don't have personal knowledge of?

3       A.    Correct.

4       Q.    And that means anything that you are

5   talking about you literally heard from someone else?

6       A.    I read on the reports, yes, sir.

7       Q.    Which would be hearsay that would be

8   related in a written form?

9       A.    I'm sorry, you said heard.  No, I didn't

10  actually -- that's what I mean, I'm sorry.

11      Q.    Right.  Okay, thank you.  Now, based on

12  your review of the activities, they discovered, you

13  say how many grams in his front pocket?

14      A.    Five grams.

15      Q.    Okay.  Now, at what point was that field

16  tested to determine whether or not it was a controlled

17  substance?

18      A.    There was no indication that it was.

19      Q.    So there is no police report from any

20  lab, the Tennessee Bureau of Investigation or

21  otherwise, that demonstrate what was found in his

22  pocket was actually a controlled substance?

23      A.    Not from a lab, no, sir.

24      Q.    And so that would also hold true for the

25  item of drugs that you found in the backpack that's

1   169 grams.  That's correct?

2          A.     165, yes, sir.

3          Q.     165.

4          A.     That would be correct.

5          Q.     Well, the indictment says 170, but you're

6   modifying that indictment to be 165 grams?

7                 MR. SUEDEKUM:  Objection, Your Honor.  I

8   don't believe that's what he's doing or what he's

9   testified to.

10                THE COURT:  Well, 165 and five makes 170.

11  Appears to me the indictment just included the total

12  amount.

13                MR. PULLEY:  Thank you, Your Honor.

14  BY MR. PULLEY:

15         Q.     And given that additional 165 grams, was

16  that 165 grams field tested there at the alleged crime

17  scene?

18         A.     No, sir.

19         Q.     So there's no -- again, no report, field

20  test or report from the Tennessee Bureau of

21  Investigation or other agency that indicates it's, in

22  fact, marijuana?

23         A.     Correct.

24         Q.     You did note that you were involved

25  relative to the gang unit for six years; is that

1  correct?

2       A.    In a prior experience, yes.

3       Q.    Right.  But relative to the stop, he was

4  stopped -- and that would be the defendant in this

5  matter -- for a registration violation; is that

6  correct?

7       A.    That's my understanding, yes, sir.

8       Q.    And how would that be gang related?

9       A.    It's not, sir.

10       Q.    It's not gang related at all, is it, sir?

11       A.    Not to my knowledge.

12       Q.    Correct.  So is it a usual position that

13  the police department finds itself in to take someone

14  into custody for a traffic violation only?

15       MR. SUEDEKUM:  Objection, Your Honor.

16  Relevance.

17       THE COURT:  We've got an indictment, so

18  probable cause has been established.  We're not here

19  on probable cause.

20       MR. PULLEY:  Yes, Your Honor.  But he was

21  taken into custody based on merely a traffic violation

22  and what was uncovered in his pocket and the car.

23       THE COURT:  I believe that's correct.

24  That's what he testified to.

25       THE WITNESS:  In that order, yes, sir.

1   BY MR. PULLEY:

2           Q.    Yes, sir.  And as a result there is an

3   amount of $210 --

4           A.    Yes, sir.

5           Q.    -- that you recovered?  Now, does that

6   indicate any gang activity?

7           A.    No, sir.

8           Q.    Does that indicate a drug trafficking

9   situation, $210?

10          A.    It could, but it's not -- that is not

11  definitive of drug trafficking.

12          Q.    And when you say it's not definitive, you

13  really mean it does not -- the amount of money does

14  not demonstrate drug trafficking?

15          A.    It can indicate either way, sir.  I mean,

16  without the drugs, $210 is not indicating --

17  indicative of any drug activity.  With the drugs,

18  especially the small denominations where transactions

19  are made on small denominations and change could be

20  made and things of that nature, then it would be.

21               Now, if he -- you know, if he worked at a

22  fast food joint, if he was delivering pizzas, that

23  could be tips.  So you have to just kind of take it

24  in -- in accordance with what they're found with.

25  Does that explain it?

1    Q.    I think that's adequate.  But at the same
2    time what does he do for a living?
3    A.    I do not know, sir.
4    Q.    Would it surprise you that he works --
5    MR. SUEDEKUM:  Objection, Your Honor.
6    MR. PULLEY:  Your Honor, he opened the
7    door to the fact that if it was a restaurant, he would
8    get tips.  I can demonstrate he could get tips in
9    another fashion.
10    MR. SUEDEKUM:  Your Honor -- he just
11    testified --
12    THE COURT:  I'm going to -- I'll let him
13    answer.  But, again, we're not here on probable cause.
14    MR. PULLEY:  Yes, sir.
15    BY MR. PULLEY:
16    Q.    And so as you discover that he had a
17    prior criminal history -- you did discover that;
18    correct?
19    A.    Yes, sir.
20    Q.    Okay.  Now, did you provide the Court or
21    the United States attorney in this case certified
22    copies of his criminal history?
23    A.    I have not.
24    Q.    So what we see in the presentence report
25    or the pretrial services report is not a certified

1   copy of --

2           THE COURT:  Wait a minute.  Counsel,

3   we're not here on probable cause.

4           MR. PULLEY:  I understand, Your Honor.

5   If I may --

6           THE COURT:  If you want -- if you want to

7   challenge whether the pretrial services report is

8   accurate on these matters, you can do so, but the

9   certified copies and everything is not -- you're --

10  you're beating off on a dead horse on that.

11          MR. PULLEY:  I do not, Your Honor.  May I

12  have a moment?

13          THE COURT:  Sure.

14          (Pause in proceedings.)

15          MR. PULLEY:  Thank you, Your Honor.  We

16  have no further questions.

17          THE COURT:  All right.

18          MR. SUEDEKUM:  Just a couple quick

19  clarifications.

20                   **REDIRECT EXAMINATION**

21  BY MR. SUEDEKUM:

22      Q.    You were asked a moment ago about whether

23  any field tests were performed on marijuana.  In your

24  experience is that typically necessary for an officer

25  to make a determination whether they have probable

1     cause to believe it is, in fact, marijuana?

2          A.    No, not for marijuana specifically.

3          Q.    I believe you testified to this earlier,

4     but just to be clear, did the defendant acknowledge

5     that it was, in fact, his marijuana?

6          A.    Yes, sir.

7          Q.    You were also asked about whether or not

8     the presence of the money alone was indicative of drug

9     trafficking.  Was there anything else in the

10    defendant's backpack inside the defendant's car that

11    was indicative that he was engaged in drug

12    trafficking?

13         A.    The baggies and the scales were what

14    would be further evidence of that, yes, sir.

15              MR. SUEDEKUM:  Nothing further,

16    Your Honor.

17              THE COURT:  All right.  Thank you, sir.

18    Be careful of that step.

19              THE WITNESS:  Will do.

20               *****WITNESS EXCUSED*****

21              THE COURT:  All right.  The government

22    have anything else, then, that you want to present at

23    this time?

24              MR. SUEDEKUM:  No, Your Honor.  We have

25    no further evidence.

1          THE COURT:  All right.  Mr. Pulley, I'll

2     be glad to hear from you, then.

3          MR. PULLEY:  Thank you again, Your Honor.

4     If we could call Derrick McWilliam, please.

5                    **DERRICK MCWILLIAM**

6     called as a witness, after having been first duly

7     sworn, testified as follows:

8                   **DIRECT EXAMINATION**

9     BY MR. PULLEY:

10         Q.    Good afternoon, sir.

11         A.    Good afternoon.

12         Q.    Would you state your name for the record,

13    please.

14         A.    Derrick McWilliam.

15         Q.    You're going to have to speak up and

16    speak --

17         A.    Derrick McWilliam.

18         Q.    Thank you.  Because this session is, of

19    course, being recorded.  Are you related in any way to

20    Mr. Claybrooks?

21         A.    Cousin.

22         Q.    You're his cousin?

23         A.    Yes, sir.

24         Q.    So how long would you say you've known or

25    been related to him?

1            A.    My whole life.

2            Q.    And what kind of person -- and would you

3      describe to the Court what kind of person

4      Mr. Claybrooks is.

5            A.    He's a good person (inaudible) takes care

6      of his kids well.

7            Q.    And do you know how many children he has?

8            A.    (inaudible) he have three.

9            Q.    And he takes care of them, as you say?

10           A.    Yes, sir.

11           Q.    Okay.  And how -- how else do you know

12     Mr. Claybrooks, other than being related to him and

13     the care for his children?

14           A.    I know -- always around (inaudible) he

15     works, you know.  Basically that's all he does.

16     Basically, you know (inaudible) bike and everything,

17     that's basically all I know.

18           Q.    When you say bike, you're referring to a

19     motorcycle?

20           A.    Yes.

21           Q.    Okay.  Have you ever known Mr. Claybrooks

22     to be employed?

23           A.    (inaudible) to know if he been employed

24     or not.

25           Q.    All right.  And Mr. Claybrooks has been

1    in the community in excess of 30 years?

2          A.    Yes, sir.

3          Q.    Okay.  And also, if I may ask you, are

4    you aware of any physical condition that he -- he's

5    presently receiving treatment for?

6          A.    No.  No, I don't.  No, sir.

7          Q.    You're not aware of a motorcycle accident

8    he was involved in?

9          A.    Yes, yes.

10         Q.    And could you describe after the

11   motorcycle accident --

12         A.    I wasn't around then.  I just heard.

13         Q.    Okay.  But he was involved in a serious

14   motorcycle accident --

15         A.    Yes, sir.

16         Q.    -- is that correct?

17         A.    Yes, sir.

18         Q.    And you are aware -- and you may or may

19   not be -- of Mr. Claybrooks has some prior criminal

20   history; correct?

21         A.    Can you repeat that again?

22         Q.    You are aware that Mr. Claybrooks has

23   some prior criminal history; is that correct?

24         A.    No, sir, not as I know of.

25         Q.    But even if you -- if it was determined

1  or demonstrated before this Court that Mr. Claybrooks

2  has some kind of criminal history, would you still be

3  of the opinion that he could be released into the

4  community?

5        A.    Yes, sir.

6        Q.    And if called upon by the Court or any

7  other service to help Mr. Claybrooks fulfill his

8  obligations to return to court, would you be in a

9  position to assist Mr. Claybrooks in that activity?

10       A.    Can you repeat that one more time, sir?

11       Q.    If there are conditions -- if the Judge

12 finds fit to release Mr. Claybrooks and the Court

13 places conditions upon his release that, for example,

14 be back in court at this time, could you help and

15 assist Mr. Claybrooks in his return to court?

16       A.    Yes, sir.

17       Q.    Could you help and assist Mr. Claybrooks

18 with the conditions that the Court sets, if any?

19       A.    Yes.

20            MR. PULLEY:  Thank you.  Nothing further.

21            THE COURT:  Okay.  Cross?

22            MR. SUEDEKUM:  Just a few questions,

23 Your Honor.

24            THE COURT:  He may have a couple

25 questions for you.  He may have several questions for

1  you.

2                    **CROSS—EXAMINATION**

3  BY MR. SUEDEKUM:

4       Q.    Good afternoon, Mr. McWilliam.

5       A.    Good afternoon.

6       Q.    How long did you say you've known the

7  defendant?

8       A.    My whole life.  My whole life.

9       Q.    How often would you say, in the past

10 year, how often do you see him or interact with him?

11      A.    Probably (inaudible) I see him every —

12 every couple days, I come by and see him.

13      Q.    Were you in court a few moments ago when

14 you heard about the offense that he's charged with

15 here?

16      A.    No, I wasn't.

17      Q.    Okay.  Are you familiar with the offense

18 he's charged with here?

19      A.    No.

20      Q.    Okay.  Are you aware that he's been

21 charged with distributing — possessing and attempting

22 to distribute marijuana?

23      A.    Do I have to answer the question?

24      Q.    I'm not asking you — I'm just asking you

25 whether or not you're aware that's what he's charged

1  with?

2          A.    I don't know.

3                THE COURT:  He's already said he's not

4  aware of it.

5                THE WITNESS:  I don't know.

6  BY MR. SUEDEKUM:

7          Q.    When was the last time that you

8  interacted with the defendant outside of court?

9          A.    Can you explain that?

10         Q.    When was the last time that you saw the

11  defendant in person prior to seeing him in court

12  today?

13         A.    (inaudible) last month ago.

14         Q.    About a month ago?

15         A.    Uh-huh (affirmative).

16         Q.    All right.  And just to clarify when you

17  said earlier, you don't know if the defendant is

18  employed or has been employed?

19         A.    No, I don't.

20         Q.    And you aren't familiar or aware of what

21  sort of criminal history the defendant has?

22         A.    No.

23                MR. SUEDEKUM:  Okay.  No further

24  questions, Your Honor.

25                THE COURT:  Okay.  Anything else, then?

1              MR. PULLEY:  Yes, Your Honor.  One more
2    if we might, Your Honor.  Nothing from this witness.
3              THE COURT:  Oh, that's what I was talking
4    about.
5              MR. PULLEY:  I'm sorry, Your Honor.  No,
6    sir.
7              THE COURT:  You can step down.  Watch
8    your step, there.  Thank you, sir.
9                 *****WITNESS EXCUSED*****
10             THE COURT:  Okay.  Call your next.
11             MR. PULLEY:  Thank you, Your Honor.  If
12   we could call Temicka Campbell.
13                 **TEMICKA CAMPBELL**
14   called as a witness, after having been first duly
15   sworn, testified as follows:
16                 **DIRECT EXAMINATION**
17   BY MR. PULLEY:
18        Q.    Good afternoon, Ms. Campbell.
19        A.    Hello.
20        Q.    Would you state your name for the record
21   and spell it, please.
22        A.    Temicka Campbell-Clay.  T-e-m-i-c-k-a
23   Campbell, C-a-m-p-b-e-l-l hyphen Clay, C-l-a-y.
24        Q.    Thank you.  And what is your relationship
25   with Mr. Claybrooks?

1    A.    Personal friend.

2    Q.    Okay.  So how long have you known

3    Mr. Claybrooks?

4    A.    A little bit over eight years.

5    Q.    And during the course of your

6    relationship with Mr. Claybrooks, can you describe

7    that relationship and what kind of person

8    Mr. Claybrooks is?

9    A.    We dated for about two years.  We ended

10   on good terms and then we become -- we been friends

11   ever since.  I talk to him on a regular basis.  We

12   discuss -- he talks about his kids.  We talk about --

13   we ride motorcycles together.  Pretty much we just

14   have a friendly relationship.

15   Q.    Great.  And what kind of person would you

16   say Mr. Claybrooks is.  We realize that you understand

17   that he takes care of his children, but anything else

18   you know about Mr. Claybrooks?

19   A.    He -- he fun-loving.  Everybody like to

20   be around him.  He not a problem person.  Probably a

21   little more, I would say he -- he -- because he does

22   have a criminal history, of course, he knows that he

23   has to protect himself.

24         So we all (inaudible) to, of course,

25   (inaudible) wake up the next day, but at the same

1   time, you know, he's never been a problem.  He always

2   joke and kid, be around everybody, so (inaudible).

3          Q.    And Mr. Claybrooks is from the Nashville,

4   Tennessee, area, ma'am?

5          A.    Yes.

6          Q.    Okay.  And in addition to that, when you

7   were around Mr. Claybrooks, he had to have the

8   opportunity to attend court; is that correct?

9          A.    Yes, sir.

10          Q.    Okay.  So that means, in your mind, does

11   he demonstrate that he will return to court as

12   requested or ordered by a court?

13          A.    He always go to court.

14          Q.    He doesn't miss court?

15          A.    No, sir.

16          Q.    He doesn't avoid court?

17          A.    No, sir.

18          Q.    Also, are you aware that Mr. Claybrooks

19   is on disability?

20          A.    I am.

21          Q.    And could you describe your basis of

22   knowledge as to why Mr. Claybrooks is on disability?

23          A.    He had a motorcycle accident a couple

24   years back.  I'm a nurse, so we often talk about, you

25   know, his -- his surgical needs or pain needs or stuff

1   like that, so.

2           Q.      And what kind of pain would you consider

3   Mr. Claybrooks to be in?

4           A.      Quite severe pain.

5           Q.      Caused by?

6           A.      He has metal screws and bolts in his back

7   and hips.

8           Q.      And how does that affect him, if you

9   know?

10          A.      It's gonna -- he's always gonna always

11  have chronic pain.  It's going to be difficult for him

12  to be incarcerated to the point where he can't see a

13  physician or to be able to maintain the pain control.

14              MR. PULLEY:  Thank you.  Nothing further,

15  Your Honor.

16              THE COURT:  All right.  Mr. Suedekum?

17              MR. SUEDEKUM:  Your Honor, I don't have

18  any questions for this witness.

19              THE COURT:  All right.  Thank you.  Watch

20  your step there.

21                  *****WITNESS EXCUSED*****

22              MR. PULLEY:  Thank you, Your Honor.

23  Reoneshee Welch, please.

24

25

1                    **REONESHEE WELCH**

2    called as a witness, after having been first duly

3    sworn, testified as follows:

4                    **DIRECT EXAMINATION**

5    BY MR. PULLEY:

6          Q.    Good afternoon, Ms. Welch.

7          A.    Good afternoon.

8          Q.    Would you state and spell your name for

9    the record, please.

10         A.    Reoneshee Welch, R-e-o-n-e-s-h-e-e Welch,

11   W-e-l-c-h.

12         Q.    And what is your relationship to

13   Mr. Claybrooks?

14         A.    His girlfriend.

15         Q.    And how long have you been in that

16   position?

17         A.    Six and a half years.

18         Q.    And could you describe to the Court what

19   type of person Mr. Claybrooks is?

20         A.    Mr. Claybrooks, he's a loving person,

21   he's one of those if you ain't got, he gonna help you

22   out (inaudible).

23         Q.    So let me just ask you what that really

24   means.  If someone asks him for something, he's more

25   than prepared to assist them in obtaining --

```
1              A.    Yes, sir.

2              Q.    -- what they require?

3              A.    Yes, sir.

4              Q.    Okay.  And what else do you know about

5    Mr. Claybrooks?

6              A.    He love his kids.  He take care of home.

7    And he love his family.

8              Q.    Would you describe how in that -- do you

9    live with Mr. Claybrooks?

10             A.    Yes, we stay together.

11             Q.    Thank you.  So how would you describe

12   that he takes care of home, what does that mean?

13             A.    Whatever needs to be done at home,

14   cooking, cleaning, doing the yard.  He also helps me

15   with my kids too.

16             Q.    How many children do you have?

17             A.    Two.

18             Q.    And do they live in the residence with

19   you?

20             A.    Yes, sir.

21                   THE COURT:  I'm sorry, how many children?

22                   THE WITNESS:  Two.

23                   THE COURT:  Two.  Thank you.

24   BY MR. PULLEY:

25             Q.    And so he helps out your children and his
```

1    children --

2            A.    Yes, sir.

3            Q.    -- correct?  All right.  And so his

4    financial situation, we've already -- he's on

5    disability, as you know; correct?

6            A.    Yes, sir.

7            Q.    And you understand why he's on

8    disability; correct?

9            A.    Yes, sir.

10           Q.    How does whatever has caused him to be

11   awarded disability, how does that affect his

12   day-to-day life?

13           A.    He hurts, but he don't let it show.  If

14   he help to do something around the house, he will do

15   something around the house, regardless if he hurting

16   or not.

17           Q.    Say that -- say that last statement.

18           A.    I say he'll do stuff around the house

19   regardless if he hurting or not hurting.  He's very

20   determined.  If he start anything, he gonna finish it.

21           Q.    Thank you.  And relative to his financial

22   distributions, is there any other way that

23   Mr. Claybrooks makes money?

24           A.    Well, he helps at the -- we have a

25   motorcycle clubhouse, so he helps at the bar.  He

1  helps out cleaning, doing everything at the bar.  So

2  the money that they stated, that the man stated, that

3  was actually the club money for him helping behind the

4  bar.

5        Q.    So that's just another financial resource

6  that he participates in with the family; correct?

7        A.    Yes.

8        Q.    And, of course, you would miss his

9  financial resources if he were, in fact, detained;

10  correct?

11        A.    Yes, sir.

12        Q.    Now, you are aware of what Mr. Claybrooks

13  has been charged with; is that correct?

14        A.    Yes,from what the -- the guy said, yes.

15        Q.    What the -- this gentleman right here

16  announced to the Court?

17        A.    Yes, sir.

18        Q.    Does that change your opinion about

19  Mr. Claybrooks in any way?

20        A.    No, sir.

21        Q.    It doesn't change your opinion that you

22  would more than welcome him home; is that correct?

23        A.    Right.

24        Q.    And if the Court found fit to release

25  Mr. Claybrooks relative to some terms or conditions,

1  would you be in place to assist Mr. Claybrooks in

2  complying with the Court's conditions?

3         A.    Yes, sir.

4               MR. PULLEY:  I have nothing further,

5  Your Honor.

6               THE COURT:  All right.  Government?

7                    **CROSS-EXAMINATION**

8  BY MR. SUEDEKUM:

9         Q.    Good afternoon, Ms. Welch.

10        A.    Good afternoon.

11        Q.    I believe you said a moment ago that the

12  money that was found in the defendant's car, that you

13  thought that was from the bar where he worked?

14        A.    Yeah, it was from the bar he works.  I

15  also works at the bar -- I also work at the bar too.

16        Q.    How do you know that the envelope with

17  money that was found in his car is -- has to be the

18  money from that bar?

19        A.    Because I counted the money before he

20  left.

21        Q.    When would that have been?

22        A.    That morning.

23        Q.    On July 4?

24        A.    Yes, sir.

25        Q.    Okay.  So you counted the money before he

1  left, but, again, how do you know the origin of where

2  that money came from?

3       A.   Because I -- I was the one who took it

4  out of the bar.  And I gave it to him because I knew

5  he was going back to the residence where we have

6  clubhouse at.  So I gave it to him before he left.

7       Q.   So you were aware of the $210 that he had

8  in the backpack?

9       A.   Yes, I was.

10      Q.   Were you aware that he had a gun in the

11  backpack?

12      A.   Yes, I was.

13      Q.   Okay.  How do you know that?

14      A.   Because it's mine.

15           THE COURT:  I'm sorry, say that again.

16           THE WITNESS:  It's mine.

17           THE COURT:  It's your gun?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  Okay.

20  BY MR. SUEDEKUM:

21      Q.   And you're the one who brought the gun?

22      A.   I actually bought it from my cousin, yes.

23  Because I have a gun license and I also carry.

24      Q.   Okay.  What was of the name of your

25  cousin --

1          A.      Marco.

2          Q.      -- who you purchased the gun from?

3          A.      Marco Smith.

4          Q.      And do you know that the defendant had

5     your gun on June 4?

6          A.      I actually left it in the car because we

7     had rode together.

8          Q.      When was that?

9          A.      The night before.  The night before the

10    incident, I think, we had rode together because we was

11    at the bar together, cleaning up and everything.  And

12    I -- I had (inaudible) because my cousin (inaudible)

13    for safetywise.  He sold it to me for safetywise, as a

14    female, because I'm a female and there's so much going

15    on in Nashville.

16         Q.      So on June 3 you left the gun in the

17    defendant's car?

18         A.      Yeah, because we rode together.

19         Q.      So you gave it to him or you put it in

20    the car yourself?

21         A.      I was the one that left in the car.

22         Q.      Where did you leave it in the car?

23         A.      It was up under the seat, but I guess he

24    seen it up under the seat and he put it in his bag.

25         Q.      Are you also aware that the defendant had

1    marijuana in the backpack?

2         A.    No I was not.

3         Q.    All right.  Were you aware that there was

4    marijuana found in the backpack?

5         A.    No, I wasn't -- not aware of that until

6    you said something about it, when you did your

7    testimony.

8         Q.    Okay.  So you weren't aware that the

9    defendant had marijuana in his possession until you --

10        A.    No.

11        Q.    -- appeared here today?

12        A.    When you said something, that's when I

13   found out about it.

14             MR. SUEDEKUM:  Thank you.  No further

15   questions, Your Honor.

16             THE COURT:  Anything else?

17             MR. PULLEY:  Just one last witness,

18   Your Honor, with the Court's permission.

19             THE COURT:  All right.  Watch your step

20   there.

21             *****WITNESS EXCUSED*****

22             MR. PULLEY:  If we could call Andra

23   Claybrooks, Your Honor.

24             THE COURT:  All right.

25

1                    **ANDRA CLAYBROOKS**

2    called as a witness, after having been first duly

3    sworn, testified as follows:

4                    **DIRECT EXAMINATION**

5    BY MR. PULLEY:

6         Q.    Good afternoon, Ms. Claybrooks.

7         A.    Good afternoon.

8         Q.    Would you state and spell your name for

9    the record.

10        A.    Andra Claybrooks.  A-n-d-r-a

11   C-l-a-y-b-r-o-o-k-s.

12        Q.    What is your relationship to Tarius

13   Claybrooks?

14        A.    I'm his wife.

15        Q.    Excuse me?  Oh, I'm sorry.  And what is

16   the status of you-all's marriage at this point?

17        A.    We separated.  We're like coparenting,

18   best of friends.

19        Q.    Now, wait a minute, don't go too fast --

20        A.    I'm sorry.

21        Q.    -- because I'll get tripped up myself.

22   How long have you-all been separated?

23        A.    Maybe seven years (inaudible).

24        Q.    All right.  And during the course of your

25   marital relationship, can you describe Mr. Claybrooks

1    to the Court?

2         A.   A loving person, always been there for

3    his kids, support his kids.  Schoolwise, hugwise.

4    Like football games, he's always just been very

5    supportive, always there for his kids.

6         Q.   And that means that he's been supportive.

7    Would you indicate that he's been supportive of you as

8    well?

9         A.   Yes, he's been supportive of me as well.

10        Q.   Would that be emotional -- emotional

11   support?

12        A.   Yes, emotional support, yeah.

13        Q.   And would that also include financial

14   support?

15        A.   Yes.

16        Q.   Okay.  And so even though you-all are --

17   have been separated for a number of years, would you

18   indicate that Mr. Claybrooks is a great person?

19        A.   Yes.

20        Q.   Thank you.

21        A.   Very good person.

22        Q.   And so that means that you are aware of

23   Mr. Claybrooks's prior criminal history?

24        A.   Yes.

25        Q.   And does his prior criminal history in

1    any way affect what you think about Mr. Claybrooks?

2          A.    No.

3          Q.    Okay.  Also, in addition to that, you are

4    aware he's on disability as well?

5          A.    Yes, sir.

6          Q.    So that means he has to share some of

7    that disability -- the disability proceeds with you?

8          A.    Yes.

9          Q.    Thank you.  Now, you don't work at the

10   club, do you, ma'am?

11         A.    No.

12         Q.    And when is the last time you've seen

13   Mr. Claybrooks prior to this incident?

14         A.    Maybe a couple of days before the

15   incident.  I see him on a regular basis because, like

16   I said, we have kids together (inaudible) his kids.

17         Q.    So you have -- you do see him on a

18   regular basis?

19         A.    Yes.

20         Q.    Thank you.  And you are aware of his --

21   the present -- the charges that are presently pending

22   against him?

23         A.    Yes, just from what the man said.

24         Q.    Okay.  And does that change your opinion

25   about Mr. Claybrooks?

1          A.    No.

2          Q.    And, again, I've asked everyone this and

3     I'll ask you again.  If the Court determines that he

4     will not be retained and set some conditions based on

5     his release, would you be in a position to assist

6     Mr. Claybrooks in complying with the Court's

7     conditions?

8          A.    Yes.

9               MR. PULLEY:  I have nothing further,

10    Your Honor.

11              THE COURT:  Government?

12              MR. SUEDEKUM:  Your Honor, I don't have

13    any questions for Ms. Claybrooks.

14              THE COURT:  All right.  Thank you, ma'am.

15    You can step down.  Watch your step there.

16                   *****WITNESS EXCUSED*****

17              MR. PULLEY:  Might I have one moment,

18    Your Honor?

19              THE COURT:  Certainly.

20              (Pause in proceedings.)

21              MR. PULLEY:  We have no further proof.

22              THE COURT:  Government have anything else

23    you want to add in the way of proof?

24              MR. SUEDEKUM:  No, nothing else in the

25    way of proof, Your Honor.

1          THE COURT:  All right.  I'll be glad to

2     hear argument of counsel, then.  I'll tell you what,

3     Mr. Pulley, because there's a presumption on it, it

4     kind of puts the burden on you, so I'll let you go

5     first to argue.

6          MR. PULLEY:  Yes, sir, Your Honor.

7          Your Honor, it's the defense's position

8     that Mr. Claybrooks should not be detained in this

9     regard.  Quite frankly, Your Honor, the State has the

10    burden of proof that there are no conditions that

11    would provide his return to court and there's no

12    combination of conditions.

13          I don't think that the government through

14    their witness, Sergeant Winter, they did not prove

15    that Mr. Claybrooks was a danger to society.  Didn't

16    prove that at all in any of his remarks.  The most

17    that they proved from Sergeant Winter is that he was

18    not (inaudible).  That's, in fact, what they proved.

19          They -- we, in fact, proved that he has a

20    physical condition that would impair his ability to

21    reside in jail.  Also, we are definitely of the

22    position that he has family ties, as evidenced by

23    everyone seated in this courtroom today.  His ties to

24    the community are extensive, long and great.

25          While he does have prior criminal

1    history, Your Honor, he served his time for that.  And

2    he's made amends regarding that.  Further, what's

3    contained in the indictment, those are merely

4    allegations.  They have not been proven at all.

5              We also understand that pursuant to the

6    Eighth Amendment that no excessive bail shall be

7    required.  Further, when the reviewing officer looks

8    at the position that we're in, one of the positions

9    that -- is it a violent or nonviolent in nature.  The

10   traffic stop itself, Your Honor, was nonviolent.  It

11   was not violent.

12             Further, it did involve narcotics,

13   Your Honor, but basically four ounces.  That's not a

14   great deal of narcotics, Your Honor.  So at this point

15   you're not in a position where the State has

16   demonstrated that he's danger -- he poses a danger to

17   the community, given the drug trafficking.

18             Further, the second consideration is the

19   weight of evidence against the person, the weight of

20   the evidence against Mr. Claybrooks.  Again, the four

21   ounces in and of itself, which is simply a nominal

22   amount, should come into play here.

23             Further, the weight of the evidence has

24   somehow been compromised by the admission by Ms. Welch

25   that the weapon, of course, is hers.  And the Court

1   can take judicial notice of a history and

2   characteristics of the defendant.

3           Your Honor, in this position I believe

4   that it would be in the Court's best interest and

5   Mr. Claybrooks's best interest, given his physical

6   limitations, his financial responsibility that he

7   upholds with his family, to place him under house

8   arrest because the Court must look to the least

9   restrictive means to assure the defendant's return to

10  court.  GPS monitoring is also available.

11          The Court would not have to -- the

12  government would not have to be in a position to

13  provide the financial wherewithal for Mr. Claybrooks

14  to wear a GPS monitor or some other appropriate device

15  that secures his location, his whereabouts and his

16  activities.

17          Therefore, Your Honor, we consider that

18  he is completely eligible to be released with

19  conditions that satisfy and meet the terms which the

20  Court may find appropriate.  Thank you, Your Honor.

21          THE COURT:  All right.  Government.

22          MR. SUEDEKUM:  Yes, Your Honor, I'll

23  begin by once again noting this is a presumption case,

24  and I -- I think it's important to clarify most of the

25  witnesses that Mr. Pulley put on on behalf of

Mr. Claybrooks talked about his ties to the community
and whether or not essentially he's a flight risk.

The government's motion wasn't based on a
risk of flight.  Our concern is that Mr. Claybrooks
has a history of selling drugs and illegally
possessing firearms, and that's the exact offense that
brings him to court again here today.  And our concern
is that there is no combination of conditions that is
going to assure the safety of the community, given the
behavior that he appears to have continually and
traditionally engaged in over the course of going on
20 years now, Your Honor.

And I -- I didn't have questions for a
couple of witnesses because I understand that they are
family or close friends of Mr. Claybrooks, but those
community ties, those family ties don't appear to be
enough to stop Mr. Claybrooks from engaging in
whatever type of behavior it is he sees fit to have
engaged in.

He's not allowed to have a firearm, but
he was in possession of a firearm here.  And I don't
agree at all with Mr. Pulley's statement that the
firearm charge is somehow been mitigated because it
may have been bought by his girlfriend.  He's not
charged with buying a firearm.  He's charged with

1  being in possession of a firearm when he's simply not
2  allowed to have it.

3           As a person in his position, carrying
4  around a quantity of drugs on this occasion, it was
5  165 grams in the backpack and five more in his pocket,
6  carrying around over $200 in cash, it makes sense why
7  he might be carrying around a firearm, and whether it
8  was for offensive purposes or simply for defensive
9  purposes, our concern is that he's not supposed to
10 have a firearm.  He's not supposed to be engaging in
11 this behavior, but there's a pattern of seeing it over
12 and over again.

13          Your Honor, I think you heard the
14 evidence from Sergeant Winter.  The fact that he was
15 not present at the scene certainly doesn't take away
16 from his ability to read and understand the incident
17 reports of what happened at the scene that day.  It
18 includes admissions by the defendant himself about
19 being in possession of the marijuana.

20          And I would, in closing, note,
21 Your Honor, that probation has agreed with the
22 position of the United States, that there are no
23 conditions that will reasonably assure his -- safety
24 of the community, and they recommend, as the
25 United States does, that he be detained pending trial.

1    Thank you, Your Honor.

2              THE COURT:  Anything else, Mr. Pulley?

3              MR. PULLEY:  No, sir.  Thank you,

4    Your Honor.

5              THE COURT:  These cases are always a bit

6    difficult.  Certainly Mr. Claybrooks has got family

7    and his wife, although separated, and his girlfriend

8    that speak highly of him and apparently he has had

9    good relations with them and with the children.  And

10   all of that is in his favor.

11             The problem I have and why I am going to

12   order detention is that this is a presumption case.

13   If it was not a presumption case, I think I would have

14   a different result.  And I think Mr. Claybrooks has

15   rebutted the presumption that he's likely to flee.

16             Given his disability and given his long

17   ties with the community and friends, I don't think

18   he's a flight risk.  The problem, though, I've got is

19   on the weapon and the drugs.  He's got three prior

20   drug convictions.  He's got three prior firearms

21   convictions.

22             Even though I have considered the fact

23   that the last firearm conviction was six years ago and

24   since that last time and where it was treated with a

25   fairly light sentence, he's not had anything other

than looks like some, I think, traffic violations,
which -- but the problem is in this case he's got a
quantity of drugs with bags and scales.

You don't have bags and scales if you're
buying.  You have bags and scales if you're selling.
Doesn't appear he's a major dealer.  But he's, again,
got a firearm in the matter with an extra magazine.

And apparently, if the evidence is
correct, that the weapon was hers and under the seat,
nevertheless he put it in the backpack with his --
with the drugs.  And that -- that just leaves me in a
position where I don't feel that -- that it doesn't
constitute a threat to the community.  Even with GPS
that only tells me where he is, not what he's doing.

So under the circumstances I'm going to
order detention in the matter.  And obviously,
Mr. Pulley, you have a right to appeal my decision to
the district judge.  We'll be in recess.

MR. PULLEY:  Thank you, Your Honor.

**\*\*\*END OF ELECTRONIC RECORDING\*\*\***

1                    **REPORTER'S CERTIFICATE**

2

3          I, Roxann Harkins, Official Court Reporter

4    for the United States District Court for the Middle

5    District of Tennessee, in Nashville, do hereby

6    certify:

7                 That I transcribed from **electronic**

8    **recording** the proceedings held on August 29, 2018, in

9    the matter of UNITED STATES OF AMERICA v. TARIUS

10   CLAYBROOKS, Case No. 3:18-cr-0199;

11          that said proceedings in connection with the

12   hearing were reduced to typewritten form by me; and

13   that the foregoing transcript is a true and accurate

14   transcript of said proceedings.

15

16          This is the 14th day of November, 2018.

17

18                    s/ Roxann Harkins_____
                      ROXANN HARKINS, RPR, CRR
19                    Official Court Reporter

20

21

22

23

24

25